# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP458 |

| | |
|---|---|
| COMPLETE TITLE: | Emer's Camper Corral, LLC,<br>      Plaintiff-Appellant-Petitioner,<br>    v.<br>Michael A. Alderman, Alderman, Inc. d/b/a<br>Jensen-Sundquist<br>Insurance Agency and Western Heritage Insurance<br>Company,<br>      Defendants-Respondents. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 386 Wis. 2d 592,928 N.W.2d 641
PDC No:2019 WI App 17 - Published

| | |
|---|---|
| OPINION FILED: | May 21, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 25, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Burnett |
| JUDGE: | Melissia R. Mogen |

JUSTICES:

KELLY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ZIEGLER, REBECCA GRASSL BRADLEY, DALLET and HAGEDORN, JJ., joined. ROGGENSACK, C.J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Steven L. Miller* and *Miller Appellate Practice, LLC*, River Falls, WI. There was an oral argument by *Steven L. Miller*.

For the defendant-respondent, there was a brief filed by *Rolf E. Sonnesyn, Beth L. LaCanne,* and *Tomsche, Sonnesyn & Tomsche,*

*P.A.*, Minneapolis, Minnesota. There was an oral argument by *Rolf E. Sonnesyn*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP458
(L.C. No. 2015CV25)

STATE OF WISCONSIN : IN SUPREME COURT

Emer's Camper Corral, LLC,

      Plaintiff-Appellant-Petitioner,

  v.

Michael A. Alderman, Alderman, Inc. d/b/a Jensen-Sundquist

Insurance Agency and Western Heritage Insurance Company,

      Defendants-Respondents.

**FILED**

**MAY 21, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

KELLY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ZIEGLER, REBECCA GRASSL BRADLEY, DALLET, and HAGEDORN, JJ., joined. ROGGENSACK, C.J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DANIEL KELLY, J. Emer's Camper Corral, LLC ("Camper Corral") thought its insurance agent had acquired a policy with a deductible of $1,000 per camper in the event of hail damage with a $5,000 aggregate deductible limit. In actuality, the policy required a $5,000 deductible per camper, with no aggregate limit. Camper Corral did not discover the truth until after a hailstorm damaged many of the campers on its lot.

¶2  Camper Corral sued its insurance agent, Michael A. Alderman, and Alderman, Inc. d/b/a Jensen-Sundquist (collectively, "Mr. Alderman") claiming he was negligent because he procured a policy that did not conform to its requirements.[1]  The circuit court directed a verdict because Camper Corral's failure to introduce evidence that an insurer would have insured the company with the deductible limits it thought it had meant that it had not proven a causal link between the agent's negligence and the sustained loss.[2]

¶3  We granted Camper Corral's petition for review to determine whether it must prove not just that an insurance policy with the requested deductibles was commercially available, but also that an insurer would actually write that policy for Camper Corral in particular.  We hold that commercial availability is insufficient to establish causation; Camper Corral must also prove it would have qualified for an insurance policy with better terms than the policy it actually obtained.  Therefore, we affirm the court of appeals.

## I.  BACKGROUND[3]

---

[1] Camper Corral also filed a claim for reformation of contract based on mutual mistake against its insurer, Western Heritage Insurance Company.  That claim is not before us.

[2] This is a review of a published court of appeals opinion, Emer's Camper Corral, LLC v. Alderman, 2019 WI App 17, 386 Wis. 2d 592, 928 N.W.2d 641, which affirmed the Burnett County Circuit Court, the Honorable Melissia R. Mogen, presiding.

[3] The facts are taken from the Complaint, trial testimony, and the circuit court's written order granting Mr. Alderman's motion for a directed verdict, which was filed on January 26, 2018.

¶4 Camper Corral (owned by Rhonda Emer and her husband) has been in the business of selling new and used camper trailers since approximately 2004.[4] Since shortly after it started business, Camper Corral has obtained its insurance through its agent, Mr. Alderman. In approximately 2007, it contacted Mr. Alderman to obtain an insurance policy to cover its camper inventory.

¶5 Mrs. Emer said Camper Corral's first garage policy (issued by General Casualty in 2007) included coverage for hail damage. She said it carried a $500 deductible per camper and, to her knowledge, had no aggregate limit on the deductible. The General Casualty policy commenced on September 30, and expired on September 30 of the following year. Succeeding policies commenced immediately upon expiration of the preceding policy.

¶6 In 2011, Camper Corral sustained approximately $100,000 in damages to numerous campers in a hailstorm. Camper Corral submitted a claim to General Casualty pursuant to the policy then in effect. General Casualty duly paid the claim and subsequently renewed Camper Corral's policy under the same terms for the 2011-2012 policy period. Camper Corral again sustained hail damage totaling approximately $100,000 in the summer of 2012. As before, General Casualty paid on the claim, but this time it sent Camper Corral a non-renewal letter prior to commencement of the 2012-2013 policy term.

---

[4] At the outset, Camper Corral focused on selling used campers only; however, in or around 2008, it also began selling new camper trailers.

¶7 Mr. Alderman told Camper Corral that its next insurance policy would have to come from "other markets," which Mrs. Emer understood to mean that Camper Corral would likely pay higher premiums and would have less favorable deductibles. Ultimately, Camper Corral obtained coverage for the 2012-2013 policy period from Western Heritage Insurance Company ("Western Heritage"). Mrs. Emer said she knew this policy contained a $5,000 deductible per camper for hail damage. She also said she understood that, due to Camper Corral's recent claims history, she could not obtain a policy with more favorable terms. Mr. Alderman told her that if Camper Corral remained claims free for one to two years, he could potentially get the deductible down to $1,000 per camper. She understood, however, that this was a goal—not a promise that it would be possible.

¶8 Camper Corral did, in fact, go claims free during the 2012-2013 policy period. According to Camper Corral, as the 2013-2014 policy period approached, Mr. Alderman contacted Camper Corral with the "great news" that he had obtained a policy from Western Heritage with a $1,000 deductible per camper for hail damage with a $5,000 aggregate deductible limit. Unbeknownst to Camper Corral, however, the 2013-2014 policy placed by Mr. Alderman with Western Heritage actually required a $5,000 per camper deductible with no aggregate limit.

¶9 In August 2014, Mr. Alderman contacted Camper Corral to discuss policy options for the upcoming 2014-2015 period. Mr. Alderman explained that he had obtained quotes from Western Heritage (the current provider) and Erie Insurance Company, an

4

insurance company in the standard market. According to Mrs. Emer, he indicated that both quotes offered a $1,000 per camper hail deductible and that the Western Heritage quote had the same terms as the soon-to-expire 2013-2014 policy. Before the two could meet to discuss the quotes, however, Camper Corral sustained hail damage to 25 campers in its inventory on September 3, 2014. As a result, Erie rescinded its quote. Western Heritage, however, could not rescind its quote because, according to Mrs. Emer's trial testimony, the hail damage claim occurred within 60 days of the renewal period.

¶10 After the hail event on September 3, 2014, Mrs. Emer discovered that the 2013-2014 Western Heritage policy actually contained a $5,000 per camper deductible for hail damage rather than the $1,000 deductible she thought it had, and that there was no aggregate deductible limit. With damage to 25 campers, Camper Corral's total deductible came to $125,000.

¶11 Camper Corral's lawsuit against Mr. Alderman claimed he breached his duty of care to Camper Corral by obtaining a policy for the 2013-2014 period with a $5,000 per camper deductible despite being aware that Camper Corral desired coverage with a lower deductible. The Complaint alleges that Mr. Alderman is liable in the amount of $120,000—the difference between the $125,000 deductible Camper Corral paid for the September 3, 2014 hail event and the $5,000 aggregate deductible Camper Corral believed it had obtained for the 2013-2014 policy period.

¶12 Mr. Alderman moved for summary judgment, arguing that Camper Corral's negligence claim must fail because there was no

5

evidence that Mr. Alderman had caused Camper Corral's damages. The circuit court denied the motion and the case proceeded to a jury trial.

¶13 Before submitting the case to the jury, Mr. Alderman moved for a directed verdict challenging the causal connection between Camper Corral's damages and his failure to obtain an insurance policy with the desired terms. Specifically, he argued there could be no causal connection unless Camper Corral had been eligible for an insurance policy with the more favorable terms it believed it had for the 2013-2014 policy period. The circuit court took the motion under advisement and counsel for Mr. Alderman then read the deposition testimony of Robert Sutton, an insurance expert Camper Corral had hired but did not call at trial, to the jury. As relevant here, Mr. Sutton stated that, because of Camper Corral's claims history in 2011 and 2012, it was not possible for Camper Corral to have obtained an insurance policy with a $1,000 hail deductible and $5,000 aggregate deductible for the 2013-2014 policy period. Mr. Alderman then renewed his motion, which the circuit court granted. The circuit court stated that "[t]he evidence presented in this case through the testimony and the exhibits presents no evidence that the policy . . . was available

or could have been available[,]" and therefore the claim failed as a matter of law.[5]

¶14 The court of appeals affirmed, noting that "no credible evidence was introduced at trial to support a finding that, absent Alderman's alleged negligence, Camper Corral could have obtained a policy with a hail damage deductible of less than $5000 per unit. . . . The circuit court's assessment of the evidence was not 'clearly wrong.'" Emer's Camper Corral, LLC v. Alderman, 2019 WI App 17, ¶24, 386 Wis. 2d 592, 928 N.W.2d 641 (internal citation omitted). We granted Camper Corral's petition for review and now affirm the court of appeals.

## II. STANDARD OF REVIEW

¶15 "A motion for a directed verdict challenges the sufficiency of the evidence." Marquez v. Mercedes-Benz USA, LLC, 2012 WI 57, ¶47, 341 Wis. 2d 119, 815 N.W.2d 314; see also Wis. Stat. § 805.14(4) (2017-18)[6] ("In trials to the jury, at the close of all evidence, any party may challenge the sufficiency of the evidence as a matter of law by moving for directed

---

[5] The circuit court determined that the case failed for the additional reason that, in a negligent procurement claim, expert testimony is necessary to establish the standard of care. Camper Corral did not introduce any such testimony. But because the court of appeals affirmed the circuit court on the question of causation, it did not address whether expert testimony on the standard of care was necessary. Emer's Camper Corral, 386 Wis. 2d 592, ¶2, n. 1. It is unclear why the dissent discusses this issue inasmuch as Camper Corral did not raise it in its petition for review and we do not address it here. See dissent, ¶8.

[6] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

7

verdict . . . ."). The court may grant the motion if it "is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." § 805.14(1). Where a circuit court grants a motion for a directed verdict, we will uphold the circuit court's decision unless the circuit court was clearly wrong. Gagliano & Co., Inc. v. Openfirst, LLC, 2014 WI 65, ¶30, 355 Wis. 2d 258, 850 N.W.2d 845 (citing Weiss v. United Fire & Cas. Co., 197 Wis. 2d 365, 389, 541 N.W.2d 753 (1995)) (when reviewing a "circuit court's decision to grant a directed verdict, the verdict must stand unless the record reveals that the circuit court was clearly wrong."). "A circuit court's evidentiary determination is clearly wrong when there is any credible evidence to support the position of the non-moving party." Gagliano, 355 Wis. 2d 258, ¶30.

¶16 Whether the circuit court applied the proper legal standard in analyzing causation is a question of law we review de novo. See State v. Greenwold, 181 Wis. 2d 881, 884-885, 512 N.W.2d 237 (Ct. App. 1994).

### III. ANALYSIS

¶17 Camper Corral says it may have recovery against Mr. Alderman because he acted negligently when he obtained an insurance policy with higher than requested deductibles. A plaintiff succeeds on such a claim by proving the standard quartet of negligence elements, which in this case comprise: (1) Mr. Alderman's duty of care to Camper Corral; (2) Mr. Alderman's breach

8

of that duty; (3) injury caused by Mr. Alderman's breach; and (4) actual loss or damage resulting from the injury. See Avery v. Diedrich, 2007 WI 80, ¶20, 301 Wis. 2d 693, 734 N.W.2d 159; Gritzner v. Michael R., 2000 WI 68, ¶19, 235 Wis. 2d 781, 611 N.W.2d 906; Robinson v. Mount Sinai Med. Ctr., 137 Wis. 2d 1, 15, 402 N.W.2d 711 (1987).

¶18 This case involves only the third of the four negligence elements. To establish causation, Camper Corral must prove that it would not have sustained its alleged $120,000 loss absent Mr. Alderman's negligence. The loss in this case represents the difference between the $125,000 aggregate deductible for which Camper Corral was responsible under the 2013-2014 Western Heritage policy and the $5,000 aggregate deductible for which it would have been responsible if Mr. Alderman had procured a policy with the terms Camper Corral requested.[7]

¶19 The circuit court granted a directed verdict because it saw no evidence linking Mr. Alderman's breach to Camper Corral's loss. It concluded that Mr. Alderman could not have caused the loss because nothing in the record indicated that Camper Corral would have qualified for a policy with the requested deductibles. Camper Corral argues, however, that its insurability under the requested terms is irrelevant. Instead, it says it need only demonstrate that policies with the requested terms were

---

[7] See, e.g., Appleton Chinese Food Serv., Inc. v. Murken Ins., Inc., 185 Wis. 2d 791, 808, 519 N.W.2d 674 (Ct. App. 1994) ("Damages arising out of a broker's failure to procure insurance are commonly determined by the terms of the policy the agent failed to procure.").

9

commercially available.  We will refer to this as the "commercial availability" theory of causation.  Alternatively, it says it can prove a causal connection between Mr. Alderman's breach and its losses based on its reliance on his representation that he had obtained a policy with the requested deductibles.  If it had known Mr. Alderman had failed in that regard, Camper Corral says, it could have changed its business practices during the 2013-2014 policy period to mitigate the vulnerability of its inventory to hail damage.  This is Camper Corral's "reliance" theory of causation.  We will address each of these theories in turn.

### A.  General Availability v. Particular Availability

¶20  With the exception of the court of appeals' opinion under review, it appears there are no reported Wisconsin cases in which the court has determined whether, in establishing causation under the commercial availability theory, a policyholder must prove it was insurable under the policy terms the broker was supposed to obtain.  So our analysis will begin with general principles of causation and discern what lessons they have for us in these circumstances.  We will also consult the decisions of other courts that have addressed themselves to this issue.

¶21  In negligence cases, "the test for causation is whether the conduct at issue was a 'substantial factor' in producing plaintiff's injury."  Baumeister v. Automated Products, Inc., 2004 WI 148, ¶24, 277 Wis. 2d 21, 690 N.W.2d 1 (citing Estate of Cavanaugh v. Andrade, 202 Wis. 2d 290, 306, 550 N.W.2d 103 (1996)).  Or, in the negative formulation, we ask whether the loss would have occurred even in the absence of Mr. Alderman's

10

negligence: "Causation is not established by testimony that even without defendant's negligence, the harm would have occurred anyway." Beacon Bowl, Inc. v. Wis. Elec. Power Co., 176 Wis. 2d 740, 788, 501 N.W.2d 788 (1993) (citing § 432(1), Restatement (Second) of Torts (1965) ("[T]he actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.")).

¶22 Camper Corral's proposed "commercial availability" test is, certainly, a necessary prerequisite to satisfying the "substantial factor" standard of causation. After all, if the insured requests a policy that is not available in the market, the insured's harm comes from its unavailability, not from the broker's failure to obtain what does not exist. So the desired policy must be commercially available before the broker's failure can be a substantial factor in causing the insured's loss. The question, therefore, resolves to whether "commercial availability" is a condition sufficient for that causal link.

¶23 We conclude that Camper Corral's "commercial availability" standard does not fully answer whether the desired policy was available within the meaning of the "substantial factor" test. An insurance policy is not a mass-produced good or service that is available to the public without regard for the circumstances of the prospective purchaser. Instead, the coverage, terms, and premium depend on factors specific to the insured company, such as, for example, its claims history. See, e.g., Leicht Transfer & Storage Co. v. Pallet Cent. Enters., Inc.,

11

2019 WI 61, ¶11, 387 Wis. 2d 95, 928 N.W.2d 534 (quoted source omitted) (explaining that we do "'not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium'"); see also Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222 (9th Cir. 1995) (explaining that an insurance applicant's loss history is a fact material to the risk).  So when we say a policy with certain deductible limits is "commercially available," what we mean is that somewhere in the market there is an insurance company willing to write that policy for a hypothetical company with a hypothetical set of insurability factors.

¶24 But just because an insurance company would write a specific policy for one company does not mean it would insure all companies under the same terms.  Consequently, "commercial availability" of the policy requested by Camper Corral establishes, at most, that some company somewhere could get the desired deductible limits.  It does not answer whether such a policy was available to Camper Corral.  So, if general commercial unavailability prevents formation of a causal link between a broker's negligence and an insured's loss, then it necessarily follows that the policy's unavailability to Camper Corral in

particular must also prevent formation of a causal link.[8]  Whether the unavailability is general, or instead particular to Camper Corral, the policy's unavailability exists independently of any negligence on behalf of the broker.  And if that is so, then the broker's negligence cannot be a substantial factor in producing Camper Corral's loss because it would have occurred even if the broker had not been negligent.  See Beacon Bowl, Inc., 176 Wis. 2d at 788 ("Causation is not established by testimony that even without defendant's negligence, the harm would have occurred anyway.").

¶25  If we did not require Camper Corral to prove it could have obtained a policy with the desired deductible limits, we would create a substantive wrinkle in the burden of proof for this type of case.  Generally, we require a tort claimant to prove each element of its claim by a preponderance of the evidence.  See, e.g., Atkinson v. Goodrich Transp. Co., 69 Wis. 5, 13, 31 N.W. 164

---

[8] Tri-Town Marine, Inc. v. J.C. Milliken Agency, Inc., 924 A.2d 1066 (Me. 2007), provides additional instruction.  In that case, the insured asserted the commercial availability theory of causation, despite conceding that the scope of coverage it sought was "not offered by or available from any other insurer[.]"  Id. at 1069.  The Supreme Judicial Court of Maine analogized the case to legal malpractice cases "in which proof that better representation would have brought about a more favorable outcome is required."  Id. at 1070.

Tri-Town Marine's analogy suggests that mere commercial availability of the desired coverage is insufficient to establish causation because it does not establish that a specific insured would have had a more favorable outcome but for the insurance agent's actions.  The insured would not have a more favorable outcome, of course, unless it was actually eligible for the desired policy terms.

(1887) ("Negligence being an affirmative fact, necessary to be proved by the plaintiff who alleges it, the universal rule is that the plaintiff must prove the fact by a preponderance of the evidence."); Zillmer v. Miglautsch, 35 Wis. 2d 691, 700, 151 N.W.2d 741 (1967) ("the plaintiff in a tort case does have the burden of proof and, in meeting this burden, he must come forward with evidentiary facts that establish the ultimate facts; and the degree of proof must be such as to remove these ultimate facts from the field of mere speculation and conjecture."); Ehlinger v. Sipes, 155 Wis. 2d 1, 12, 454 N.W.2d 754 (1990) ("To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm."); see also Wis JI——Civil 200 (2004) (explaining that the burden of proof "is to satisfy [the factfinder] by the greater weight of the credible evidence, to a reasonable certainty . . . .").

¶26 But in asking us to accept "commercial availability" as sufficient proof of causation, Camper Corral is actually asking us to grant it an evidentiary presumption to help it bridge the gap between general and particular availability of the desired insurance policy. It says this presumption is necessary so that we do not "impose [on the insured] the difficult task of having to retroactively prove——often years later——that an individual plaintiff could have obtained a better policy during the policy period at issue." We do not think the difficulty of a task is a sufficient basis for relieving a plaintiff of its duty to prove the essential elements of its claim. Alternatively, Camper Corral

14

suggests we could make the presumption rebuttable by allowing the insurer to prove the required policy was not actually available to the insured. See, e.g., United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 499 (4th Cir. 1998) (citing Patterson Agency, Inc. v. Turner, 372 A.2d 258, 261 (Md. Ct. Spec. App. 1977)). This, of course, would require proof of a negative. And because insurability is not susceptible of generalizations, Mr. Alderman would have to prove that no insurer in the market would insure Camper Corral under the requested terms.

¶27 Aside from evidentiary difficulties, Camper Corral has offered no rationale for either relieving it of its duty to prove each element of its claim, or requiring Mr. Alderman to negate the presumption in favor of causation. Therefore, we conclude that the general principles governing proof of causation do not support Camper Corral's "commercial availability" standard.

¶28 Nor do we find anything in prior opinions (either ours or those of other courts) that suggests we should modify the teaching of our general principles. Camper Corral directs our attention to Kapiloff, in which the Fourth Circuit recognized that, under Maryland law, "[t]he burden of proving the nonavailability of insurance coverage is on the insurer or the broker, because it is an affirmative defense that is within the peculiar knowledge of those familiar with the market." 155 F.3d at 499 (citing Patterson, 372 A.2d at 261). The Kapiloff court relied on Patterson, a Maryland court of appeals opinion, which in turn relied on an A.L.R. annotation for its reasoning. The annotation describes "a split of authority . . . as to who bears the burden

15

of proof on the availability of insurance . . . ." Patterson, 372 A.2d at 261. The annotation observed that several jurisdictions place the burden on the plaintiff:

> In addition to being required to establish the existence of a duty to procure insurance and its breach, the plaintiff in an action against an agent or broker for failure to procure insurance has often been required to show that there was a casual (sic [causal]) relationship between the negligence of the agent and the loss suffered by the client. In several jurisdictions, the causation requirement has been a formidable barrier to recovery, which has prevented a finding of liability against the agent or broker unless the client is able to clearly show that were it not for the agent's negligence, he would have been issued a valid policy which would have protected him against the loss which he suffered.

Id. (footnote omitted) (citing MacDonald v. Carpenter & Pelton, Inc., 31 A.D.2d 952 (N.Y. App. Div. 1969) and Pac. Dredging Co. v. Hurley, 397 P.2d 819 (Wash. 1964)). But not all courts employ that standard:

> [A] few courts, recognizing that the question of whether a valid policy would have been issued is a matter peculiarly within the knowledge of the agent or broker, have concluded that causation need not be proved by the client and will only enter the case if the issue is raised by the agent as an affirmative defense.

Patterson, 372 A.2d at 261 (citing Annot., 64 A.L.R.3d 398, 407 (1975); Hans Coiffures Int'l, Inc. v. Hejna, 469 S.W.2d 38 (Mo. App. 1971); Scott v. Conner, 403 S.W.2d 453 (Tex. Civ. App. 1966)).

¶29 In response to the annotation's content, the Patterson court cryptically analogized the causation issue to a completely unrelated affirmative defense. Specifically, it noted that when concurrent causes result in a loss, one covered by the insurance policy and one not, it is the insurer's burden to prove the loss

16

resulted from the non-covered cause. Based on this analogy, the Patterson court concluded that the "burden of proving the non-availability [of the requested insurance] should be shouldered by the insurer, in the nature of an affirmative defense." Patterson, 372 A.2d at 261. So Patterson, and by extension Kapiloff, provide guidance only if we were to conclude that Camper Corral's insurability is a piece of information peculiarly within Mr. Alderman's knowledge or that insurability is akin to a concurrent causation question. But no party has alleged that Mr. Alderman alone would know whether an insurance company would deem Camper Corral insurable with the requested deductibles, and we discern nothing so peculiar about this information that it could not be established through alternative sources (such as other insurance brokers or an expert witness). Further, the concurrent causation analogy is inapt because, under those circumstances, the insured still must prove the existence of a cause sufficient to explain the loss. Here, however, the Patterson formulation would allow Camper Corral to establish causation without ever proving an event sufficient to result in its loss.

¶30 Camper Corral also cites Appleton Chinese Food Serv., Inc. v. Murken Ins., Inc., 185 Wis. 2d 791, 519 N.W.2d 674 (Ct. App. 1994), and Rainer v. Schulte, 133 Wis. 130, 113 N.W. 396 (1907), as examples of recovery without proof of insurability under more favorable terms. It acknowledges that neither case explicitly addressed the question, and we agree with that assessment. In the Appleton Chinese Food Service case, the court of appeals recounted our prior statement that "'[a]n insurance broker is bound to

17

exercise reasonable skill and diligence in the transaction of the business entrusted to him and he will be responsible to his principal for any loss from his failure to do so . . . .'" Appleton Chinese Food, 185 Wis. 2d at 802-03 (alteration in original; one set of quotation marks omitted) (quoting Master Plumbers Ltd. Mut. Liab. Co. v. Cormany & Bird, Inc., 79 Wis. 2d 308, 313, 255 N.W.2d 533 (1977)). As a general statement of law, that is undoubtedly true. But the statement does not extend far enough to address the question here, which is whether the broker's failure was actually responsible for the insured's loss.

¶31 We had no need to address the issue in Rainer because we resolved the case on grounds that did not relate to the plaintiff's insurability under the requested terms. There, we considered an alleged insurance agent's agreement to obtain an insurance policy for his customer, which he failed to do before the customer suffered a loss that would have been covered by the policy. In considering a challenge to the sufficiency of evidence in support of the jury verdict, we said "it was immaterial whether the defendant, at the time, had authority to represent and bind some unnamed insurance company or some insurance agent. The defendant certainly had authority to bind himself to procure such insurance." Rainer, 113 N.W. at 397 (internal citations omitted). But that statement responded to the alleged agent's defense that "at the time of entering into said contract the defendant was not an insurance agent, and was not authorized to enter into said contract for or on behalf of any insurance company or person whatsoever[.]"

18

Id. What we said about immateriality is good support for the proposition that an alleged agent's lack of authority to obtain insurance is not a bar to a successful claim. But it does not necessarily support the proposition that a promise to obtain insurance is actionable without regard to whether the person was insurable. As a general rule, if a defendant does not contest a complaint's specific allegation, it is taken as admitted and the parties do not contest it further. See Wis. Stat. § 802.02(4).[9] The Ranier opinion does not say whether the defendant had put the plaintiff's insurability at issue, and so the opinion's silence on that subject may simply reflect that the defendant conceded the issue.

¶32 But just as there are no cases authoritatively establishing that Camper Corral need not prove an insurer would have written a policy with the requested deductibles, there are no cases authoritatively establishing the converse. A majority of jurisdictions require, at the very least, evidence that a policy with the requested terms was commercially available. See, e.g., Hawk v. Roger Watts Ins. Agency, 989 So.2d 584, 591 (Ala. Civ.

---

[9] Wisconsin Stat. § 802.02(4) provides:

Averments in a pleading to which a responsive pleading is required, other than those as to the fact, nature and extent of injury and damage, are admitted when not denied in the responsive pleading, except that a party whose prior pleadings set forth all denials and defenses to be relied upon in defending a claim for contribution need not respond to such claim. Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided.

19

App. 2008) (lack of evidence that the desired coverage was commercially available resulted in inability to establish causation); Johnson & Higgins of Alaska Inc. v. Blomfield, 907 P.2d 1371, 1374-75 (Alaska 1995) (explaining that the majority rule requires evidence of commercial availability); Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 244 (Colo. 1987) (requiring plaintiff to introduce evidence of commercial availability before requiring defendant to introduce evidence of noninsurability); Tri-Town Marine, Inc. v. J.C. Milliken Agency, Inc., 924 A.2d 1066, 1069-1070 (Maine 2007) (collecting cases). But as discussed above, "commercial availability," while a necessary condition to a successful claim, is not necessarily a sufficient condition.

¶33 We find the Minnesota case Melin v. Johnson, 387 N.W.2d 230 (Minn. Ct. App. 1986), particularly helpful in addressing the question of general versus particular availability of the requested policy terms. In Melin, the plaintiff sought long-term disability coverage through his insurance agent. Id. at 231. The agent obtained coverage through a group policy because the plaintiff was not insurable under an individual policy. Id. But the agent did not tell Mr. Melin that his coverage under the group policy was less favorable than what he had expected. Id. So Mr. Melin sued his agent for his "negligen[ce] in failing to inform [him] of limitations contained in the insurance policy he procured." Id. at 232. With respect to Mr. Melin's "negligent procurement" cause of action, the court said that, "[w]ithout some evidence that reasonable care would have produced a better policy,

20

there is no breach of duty under this doctrine." Id. A better policy could not be produced, of course, unless the plaintiff was actually insurable under the better terms. So the Melin court concluded that "[i]f the jury's verdict was based on the theory that [the agent] was negligent in his duty to procure insurance, the evidence is conclusive against that verdict." Id. The same result obtained with respect to the plaintiff's "negligent failure to inform" cause of action.

¶34 Here in Wisconsin, we have hinted that availability of the insurance policy to the particular plaintiff is important, not just generalized commercial availability. In Wallace v. Metropolitan Life Ins. Co., 212 Wis. 346, 248 N.W. 435 (1933), we addressed causation in the context of an insurance company's unreasonable delay in rejecting a life insurance application. In that case, Mr. Bell, the prospective insured, did not know the insurer had rejected his application before he died. Upon the intended beneficiary's claim of negligence in notifying Mr. Bell of the underwriting decision, the court concluded that "there is no evidence tending to show that the assured could have obtained other insurance of the same kind and character." Id. at 436 (emphasis added). Without such evidence, it was "evident that plaintiff has proved no damages." Id. Our conclusion did not depend on the general commercial availability of life insurance

21

policies in the desired amount, but instead on whether Mr. Bell in particular was insurable.[10]

¶35 Wallace and Melin are consistent with our general principles regarding causation. "Causation is not established by testimony that even without defendant's negligence, the harm would have occurred anyway." Beacon Bowl, Inc., 176 Wis. 2d at 788. It necessarily follows that if the harm would have occurred even in the absence of the defendant's negligence, then it is impossible for the negligence to have been a "substantial factor in producing [plaintiff's injury]." Baumeister, 277 Wis. 2d 21, ¶24; see also

---

[10] Chief Justice Roggensack says Wallace v. Metropolitan Life Ins. Co., 212 Wis. 346, 248 N.W. 435 (1933), "has no relevance" because it addressed life insurance whereas this case addresses casualty insurance. Dissent, ¶62. But she does not say why that difference affects the proposition that there can be no causation unless the plaintiff could have obtained a policy with the desired terms.

The dissent prefers Kukuska v. Home Mut. Hail-Tornado Ins. Co., 204 Wis. 166, 235 N.W. 403 (1931), in which we held that a farmer had a good cause of action for an insurer's failure to timely accept or reject an insurance application because, the dissent says——quoting Kukuska——"'had [the farmer] been seasonably notified, other insurance could have been readily obtained.'" Dissent, ¶63 (citing Kukuska, 204 Wis. at 173-74) (brackets in Chief Justice Roggensack's dissent). But the full sentence from which the dissent takes that quote shows that the case does not support the dissent's proposition. We said: "So that, upon any theory, the defendant would be liable to the plaintiff for the amount of damages sustained where it appeared, as the court found in this case, that, had he been seasonably notified, other insurance could have been readily obtained." Kukuska, 204 Wis. at 173-74 (emphasis added). This was not a normative statement; it was instead an observation that the circuit court had found, in that case, that the farmer could have readily obtained the insurance. Not that it was commercially available, but that it was obtainable. Camper Corral, of course, has not shown it could obtain an insurance policy with the desired deductible terms.

Bayly, 739 P.2d at 244 ("[E]vidence that the type of insurance sought by the plaintiff was not generally available in the insurance industry when the broker or agent procured the plaintiff's insurance policy, <u>or that, even if this type of insurance was generally available, the plaintiff nonetheless was uninsurable</u>" precluded a finding of causation (emphasis added)).

¶36 Based on these principles, and fortified by both Wallace and Melin, we conclude that Camper Corral cannot prove causation under the commercial availability theory in the absence of evidence that it was insurable under a policy with more favorable terms. Evidence establishing mere commercial availability demonstrates only that <u>someone</u> may qualify for insurance under the specified terms. It does not establish that the desired insurance terms were available to Camper Corral in particular. Without evidence that an insurer would have written a policy for Camper Corral with more favorable terms, it is not possible to say that Mr. Alderman's negligence was a substantial factor in causing the loss, and no such evidence exists in this case. As far as the state of the record is concerned, it cannot be said that Camper Corral's loss would not have happened in the absence of Mr. Alderman's negligence. Indeed, Camper Corral's own expert testified that, based on Camper Corral's claim history in 2011 and 2012, he did not believe it would have qualified for a $1,000 hail deductible per camper with a $5,000 total maximum deductible during the 2013-2014 policy period. Therefore, the circuit court did not err in holding there was no credible evidence from which the jury could

23

find that Mr. Alderman's negligence caused Camper Corral's loss under the commercial availability theory.[11]

¶37 Chief Justice Roggensack's dissent would make this an entirely academic discussion by finding that Camper Corral proved it was actually insurable under a policy with a $1,000 deductible per unit and a $5,000 aggregate limit. Camper Corral did not make that argument here, nor in the court of appeals, nor in the circuit court. In fact, in the entire history of this case, Chief Justice Roggensack is the only one who has suggested Camper Corral was insurable under those terms. Even Mrs. Emer did not make this claim in her testimony. What she said was that the summary sheet from a Western Heritage insurance quote (Exhibit 103)[12] led her to believe that Camper Corral's insurance policy contained the favorable deductible terms. But she never claimed the quote proved

---

[11] Chief Justice Roggensack is worried that this conclusion "is unnecessarily harsh on the consumer" because it "will immunize misrepresentations by insurance agents who have superior knowledge of how to search the insurance industry to determine whether the insured was eligible for particularized insurance." Dissent, ¶61. It is not harsh at all. It simply prevents a plaintiff from imposing liability on a defendant for failing to procure something for which the plaintiff was not eligible. If the insurance agent's representations cause the insured to expose itself to risk it would not have undertaken if it had known it was not eligible for the requested insurance, the insured may have a reliance claim (as described below). If we were to agree with the Chief Justice, we would be awarding a windfall to Camper Corral by allowing it a recovery when there is no evidence any company would have insured it under the requested terms. Denying a recovery to which Camper Corral is not entitled is not harsh, it is just.

[12] In the trial, Mrs. Emer actually referred to Exhibit 8, which is the same as Exhibit 103. Exhibit 8 was not admitted into evidence, so we refer to Exhibit 103 instead.

24

she was actually insurable under a policy with the $1,000/$5,000 deductible terms. Nor did anyone else, until the Chief Justice's dissent. Indeed, Camper Corral's attorney even conceded this specific point when he acknowledged that if Camper Corral were required to prove it could have obtained a better policy during the 2013-2014 policy period, then "the claim fails."[13]

---

[13] Chief Justice Roggensack also finds significance in the difference between Exhibit 103 (Western Heritage's quote from August 2, 2013) and Exhibit 106 (Western Heritage's revised quote from September 12, 2013). Based on those differences, the Chief Justice concludes that "nevertheless, Michael Alderman increased the deductible for hail damage. A review of Rhonda Emer's testimony in regard to the $7,493 premium she believed she paid and the coverage afforded by Exhibit 8, as also shown on Exhibit 103, comes in sharp contrast to the lower premium of Exhibit 106, which has a higher hail damage deductible." Dissent, ¶58.

This is erroneous for two reasons. First, the differences in the quotes are not necessarily attributable to some nefarious plan executed by Mr. Alderman. There is a much more innocent explanation, one offered by Mrs. Emer herself. She testified that the first quote was not acceptable to her because she wanted the policy's total coverage reduced from $800,000 to $300,000, and she wanted the per camper coverage increased from $25,000 to $50,000. So she rejected the quote contained in Exhibit 103.

Secondly, the Chief Justice's argument depends on the unsound assumption that Exhibit 103 proves Camper Corral was, in fact, eligible for $1,000/$5,000 deductible terms (which is not a warranted assumption, as described above). Although it is true that Exhibit 106 refers to the hail deductible on the summary page and Exhibit 103 does not, that has nothing to do with what the policy's actual terms would be. Both Exhibit 103 and Exhibit 106 indicate that the hail damage deductible would be found in Form WHI 26-0496.

25

## B. Reliance

¶38 Alternatively, Camper Corral says it can establish a causal connection between Mr. Alderman's negligence and its loss through the principle of detrimental reliance. It refers us to Runia v. Marguth Agency, Inc., 437 N.W.2d 45 (Minn. 1989), as an example of how this principle would function in the context of a broker's failure to obtain an insurance policy on the terms requested by the insured. The case involved an insured's request that his agent obtain coverage on a snowmobile he owned. Id. at 46-47. The insured told the agent that the policy should cover himself, his daughter, and any other individual who may use the snowmobile. Id. The agent obtained a policy and attached the coverage to the insured's homeowner's policy. Id. at 47. The insured then loaned the snowmobile to his daughter, who was injured in an accident while riding it with her fiancé. Id. In the ensuing lawsuit, the insured's daughter obtained a judgment against the fiancé, but the insurance company denied coverage because only the father was covered by the policy it wrote. Id.

---

The Chief Justice suggests that, in making this point, we are not accounting for the binding nature of an insurance quote. Dissent, ¶59. This is not about whether a quote is binding, it is about what the quote's summary page says. The absence of a separate hail deductible on the quote's summary page does not prove the quote did not provide for a separate hail deductible. One of the unavoidable aspects of a summary is that, by definition, it is less than comprehensive. The absence of a piece of information on the summary page is not evidence it does not exist elsewhere in the quote, it is just evidence it didn't make it to the summary page. And, as already mentioned, the quote did say the hail deductible would be found in Form WHI 26-0496. So the absence of the hail deductible on the summary page proves precisely nothing.

26

The court agreed the insurance company had no duty to indemnify. Id.

¶39 There then arose a second lawsuit, this time against the insurance agent for negligently failing to obtain an insurance policy on the requested terms. Upon the question of whether the failure to procure an insurance policy on those terms caused the loss, the Runia court held that if the plaintiffs had known they did not have the coverage they believed they had, they simply could have "elect[ed] not to engage in the uninsured activity." Id. at 49. Thus, the court stated that "[l]iability attaches independently of whether any insurance policies would have provided the requested coverage." Id.

¶40 Camper Corral says it could have altered its behavior, just like the Runia plaintiffs could have, if it had known its policy had deductible limits higher than requested. For example, it says it could have reduced or eliminated its on-site inventory, or stored its inventory under cover, or made alternate arrangements with the supplier, or stopped selling new campers altogether. Any of these alternatives, it argues, would have allowed Camper Corral to minimize or eliminate its uninsured risk. And that, it concludes, proves a causal connection between Mr. Alderman's actions and its damages.

¶41 We do not preclude the possibility of proving causation under the reliance theory, but we need not resolve the issue here. Camper Corral offered the many ways by which it could have mitigated or eliminated its exposure to high deductibles as theoretical possibilities. But it referred to no evidence in the

27

record to suggest it actually would have availed itself of one of these methods of risk mitigation. Because the record contains no evidence that Camper Corral would have changed its business practices had it known of the higher deductibles, the circuit court did not err in concluding there was no credible evidence of causation.

### C. Camper Corral Forfeited Its Alternate Theories of Recovery

¶42 Finally, Camper Corral argues that it is entitled to damages under the benefit of the bargain rule because its Complaint, although asserting a single negligence cause of action, can nevertheless be construed as having stated claims for breach of contract and strict responsibility misrepresentation. According to Camper Corral, these alternate theories of recovery are available because the circuit court's decision was actually a decision on a summary judgment motion rather than a motion for a directed verdict. This is so, says Camper Corral, because the circuit court relied on materials outside the trial record in reaching its decision. We disagree, for two reasons.

¶43 First, the court of appeals properly analyzed Camper Corral's argument that the circuit court actually decided the motion as a request for summary judgment rather than a directed verdict. See Emer's Camper Corral, LLC, 386 Wis. 2d 592, ¶13 (explaining that it would review the circuit court's ruling under the directed verdict standard because the circuit court did not cite evidence outside the trial record in the portion of its written decision addressing Mr. Alderman's causation argument and

28

that the expert deposition testimony the circuit court referenced was read to the jury at trial). We agree with the court of appeals and see no need to further expand upon its rationale.

¶44 Second, and perhaps more importantly, we will not consider these issues because Camper Corral did not present them to us in its petition for review. See Wis. Stat. § (Rule) 809.62(6) ("If a petition is granted, the parties cannot raise or argue issues not set forth in the petition unless ordered otherwise by the supreme court."). Here, Camper Corral's petition for review identified one issue: "In a suit for failure to procure requested insurance, must the plaintiff prove causal damages by showing she could have personally obtained an insurance policy equal to or better than the policy promised to her by her agent?" Camper Corral acknowledges that its petition did not list its alternate theories of recovery as reviewable issues, but says its summary of its position in a lengthy footnote adequately preserved them for presentation in their merits briefs. However, our order granting review in this case said that Camper Corral "may not raise or argue issues not set forth in the petition for review unless otherwise ordered by the court . . . ." We have been presented with no adequate reason for departing from the terms of our order, and therefore will not address Camper Corral's alternative theories of recovery.[14]

---

[14] The court of appeals likewise declined to address Camper Corral's alternate arguments regarding breach of contract and strict responsibility misrepresentation because Camper Corral failed to raise the arguments in the circuit court. Emer's Camper Corral, LLC, 386 Wis. 2d 592, ¶¶26-27.

29

IV.  CONCLUSION

¶45  In a cause of action for negligent procurement of an insurance policy, the insured cannot establish the insurance agent's negligence was a "substantial factor" in causing its loss under the commercial availability theory without evidence that a policy with the requested terms was available to the insured.[15] Because Camper Corral failed to introduce any evidence that it was eligible for an insurance policy with the requested deductible limits, we conclude that the circuit court did not err in granting Mr. Alderman's motion for a directed verdict.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[15] Our decision today does not foreclose the possibility of establishing causation under the reliance theory.

¶46 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* The majority opinion is wrong on the law and wrong on the facts. First, it creates a new and rigid evidentiary burden for causation that immunizes an insurance agent's misrepresentations about the insurance policy he said that he was providing and the policy he actually provided, all at the expense of the consumer.[1] Second, even if I were to accept the new evidentiary burden the majority opinion places on insureds, Rhonda Emer's trial testimony and trial Exhibit 103 provided a factual basis to show that coverage with a $1,000/$5,000 deductible for hail damage that she thought she bought was commercially available and that Camper Corral was eligible for that coverage during the 2013-14 policy term from Western Heritage because those are the terms that were on the exhibit provided to Camper Corral. Accordingly, I respectfully dissent.

## I. BACKGROUND

¶47 This case was tried, in part, before a jury based on Camper Corral's claim that insurance agent, Michael Alderman, negligently did not provide the insurance policy for Camper Corral that he represented to Rhonda Emer that he was providing.[2] Rhonda Emer based her claim on statements that her insurance agent, Michael Alderman, made orally and as provided in Exhibit 8, a quote from Western Heritage that he reviewed with her at their meeting for the 13/14 insurance renewal. In support of her belief that

---

[1] Majority op., ¶3.

[2] R. at 107, 65-66.

1

she had purchased a 2013-14 year policy that had a $1,000 hail damage deductible with a $5,000 cap (hereinafter $1,000/$5,000), Rhonda Emer testified about deductibles for hail damage that she believed Camper Corral purchased based on what Michael Alderman told her and the quote from Western Heritage that he reviewed with her:

> Q. I am showing you now what has been marked as Exhibit 8. Do you recognize that document? Just looking at the first page, do you recognize this document, the first page?
>
> A. Yes, definitely.
>
> Q. Can you describe what that first page is?
>
> A. Yes, it's a cover letter from Jensen-Sundquist signed by Michael Alderman.
>
> Q. Okay. Do you recall receiving that?
>
> A. Yes, I do.
>
> Q. When did you receive it?
>
> A. I received that at our meeting for the '13/'14 renewal.[3]
>
> . . . .
>
> Q. What is the date on the first page of Exhibit No. 8?
>
> A. August 6, 2013.[4]
>
> . . . .
>
> Q. I'd like to turn your attention to Page No. 2.
>
> A. Okay.

---

[3] R. at 107, 146.

[4] R. at 107, 148.

2

Q.    Do you recognize that document?[5]

A.    Yes, I do.

Q.    And can you describe for the jury what that document is?

A.    This is a summary page, a declaration page that is a snapshot of your deductibles for a certain policy term.

Q.    Okay.  And what are your deductibles for wind and hail?

A.    Okay.  Well, this is where it gets explained to me by Mr. Alderman in person.

Q.    I am asking you --

A.    Okay.

Q.    Review Page No. 2 of Exhibit 8, and tell me what your deductibles are for wind and hail.

A.    My deductible for wind and hail is $1,000 per unit with a $5,000 maximum aggregate out-of-pocket.

. . . .

A.    It says under dealer physical damage comp and collateral 1,000/5,000.[6]

. . . .

Q.    Is there anything in that document that specifically defines what the deductible for hail would be?

A.    Yes.  Under dealer physical damage comp and collateral is marked as 1,000/5,000 maximum aggregate.[7]

. . . .

---

[5] Id.

[6] R. at 107, 149.

[7] Id., 154.

Q. Okay. And during this conversation with Mr. Alderman, when you saw Exhibit 8 for the very first time, did you confirm with him -- did you ask him to make sure that you only had a $1,000 hail deductible?

A. Oh, most certainly, and then he pointed it out to me.[8]

. . . .

Q. Okay. And how long was it after that meeting that you got the policy?

A. I never received the policy.

Q. Ever?

A. Not until I requested it after my hailstorm.

Q. When was your hailstorm?

A. September 3rd of 2014.[9]

. . . .

Q. And what is the premium for 2013-'14?

A. $5,200 plus -- well, actually it's more than that. It's $7,493 . . . .[10]

Q. I am asking about the quote, Exhibit No. 8.

A. Yes.[11]

¶48 Through her testimony set out above, which is supported by trial exhibits, Rhonda Emer explained at least two things that are important to this appeal. First, her testimony and Exhibit 103, dated August 2, 2013 provided a factual basis to show that Camper Corral was eligible for a $1,000/$5,000 hail damage

---

[8] Id., 158.

[9] Id., 163.

[10] R. at 108, 9.

[11] Id., 10.

4

deductible for the 2013-14 year, notwithstanding its history of hail damage, because those are the terms that were on the exhibit provided to Camper Corral.[12] And second, the terms of what she thought she bought in August 2013 changed between the time when Michael Alderman reviewed the quote for the 2013-14 policy year with her and when she made her claim for damages due to the September 3, 2014 hail storm.[13]

## II. DISCUSSION

### A. Standard of Review

¶49 The circuit court dismissed this case based on a motion for a directed verdict, pursuant to Wis. Stat. § 805.14(3), and on summary judgment, pursuant to Wis. Stat. § 802.08, during a jury trial. In either case, judgment cannot be granted to a movant if there is any dispute of material fact. Anthony Gagliano & Co., Inc. v. Openfirst, LLC, 2014 WI 65, ¶¶30-32, 355 Wis. 2d 258, 850 N.W.2d 845.

¶50 Although we have said that an appellate court should not overturn a circuit court's dismissal on directed verdict unless the circuit court is "clearly wrong," a circuit court is clearly wrong "when there is any credible evidence to support the position of the non-moving party." Id., ¶30. Furthermore, we review independently whether there is any credible evidence to support the non-moving party's position. Id., ¶32.

¶51 We also independently review whether summary judgment was properly granted, employing the same standards as the circuit

---

[12] Id., Ex. 103.

[13] Id., Ex. 106.

5

court and the court of appeals, while "benefitting from their prior discussions." Id., ¶33 (citing City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶13, 302 Wis. 2d 599, 734 N.W.2d 428).

### B. Directed Verdict/Summary Judgment

#### 1. Directed verdict

¶52 The standard under which a directed verdict may be granted during a jury trial is set out in Wis. Stat. § 805.14(3), which provides:

> At the close of plaintiff's evidence in trials to the jury, any defendant may move for dismissal on the ground of insufficiency of evidence. If the court determines that the defendant is entitled to dismissal, the court shall state with particularity on the record or in its order of dismissal the grounds upon which the dismissal was granted and shall render judgment against the plaintiff.

In regard to the particularity for its decision, the circuit court's Order of January 26, 2018 provided:

> This Court does not find that Alderman's conduct was so obviously negligent as a matter of law, as such, expert testimony is necessary to ascertain whether Alderman's conduct fell within the scope of the usual care exercised by insurance professionals under the circumstances. . . .[14]
>
> In this case, Camper Corral has failed to produce any evidence that a policy was available or could have been available in the insurance market for the September 30, 2013-September 30, 2014 time period with a $1,000.00 per auto/camper deductible and a $5,000.00 aggregate for wind, hail, earthquake, and flood for Camper Corral. Further, Camper Corral has produced no evidence to demonstrate that Michael Alderman misrepresented the insurance coverage. . . .
>
> Based on the evidence provided, along with the fact that the cause of action pleaded by Camper Corral against

---

[14] R. at 86, 3

Alderman for professional negligence requires expert testimony at the time of trial, and that Camper Corral has failed to provide any evidence where a reasonable jury could find that Alderman were a direct and proximate cause to the damages sustained by Camper Corral, and that expert testimony was needed to prove causation in this matter, the Court grants Alderman's motion.

IT IS HEREBY ORDERED that: Judgment for the Defendant is GRANTED.[15]

¶53 The circuit court's decision that dismissal was required in part because Camper Corral did not provide expert testimony about standards applicable to insurance agents is without legal foundation and is clearly wrong in at least two respects. First, no expert testimony is necessary to prove that an insurance agent misrepresented the terms of the policy that he sold to an insured. All that is needed to reach the jury on misrepresentation is trial testimony showing Alderman made a representation of material fact; it was untrue; Rhonda Emer believed the representation to be true; and she reasonably relied on it to the damage of Camper Corral. Whipp v. Iverson, 43 Wis. 2d 166, 169, 168 N.W.2d 201 (1969). Benefit of the bargain is the legal measure of damages for detrimental reliance, i.e., the difference between the payment Camper Corral would have received for the 2014 hail damage if the deductible had been $1,000/$5,000 and what she actually was paid. Appleton Chinese Food Serv., Inc. v. Murken Ins., Inc., 185 Wis. 2d 791, 808, 519 N.W.2d 674 (Ct. App. 1994) (concluding that damages are measured by the terms of the policy that the insurance agent failed to provide). Michael Alderman asserted he did not represent that the 2013-14 policy had hail damage deductible of

---

[15] Id., 7.

7

$1,000/$5,000. This created a dispute of material fact that the jury should have decided and on which no expert testimony was required.

¶54 Second, Camper Corral's trial did produce evidence that a policy with a $1,000/$5,000 deductible for hail damage was commercially available and that Camper Corral was eligible to purchase it. The circuit court, the court of appeals and the majority opinion ignore Exhibits 103 and 106[16] and Rhonda Emer's testimony, which is repeated above, that discusses the Western Heritage quote that Michael Alderman gave her shortly after August 6, 2013, which shows Camper Corral's eligibility for that policy (Exhibit 8).[17]

¶55 Rhonda Emer's testimony points out differences in the quotes: the dates are different, the premiums for the year are different, and the statement about deductibles for hail damage are different. Exhibit 103's quote is dated August 2, 2013 and Exhibit 106's quote is dated September 12, 2013. Exhibit 103 has a $1,000/$5,000 deductible, without singling out hail damage, but its premium for this coverage was $7,493 per year. Exhibit 106 has a notation at the bottom that said, "$5,000 DEDUCTIBLE APPLIES TO WIND, HAIL, EARTHQUAKE AND FLOOD."[18] However, with that

---

[16] Michael Alderman identified Exhibit 106. R. at 108, 86.

[17] Each of Western Heritage's quotes for Camper Corral is titled "Garage Premium Summary." Exhibits 8, 103 and 106 are quotes from Western Heritage.

[18] This statement about deductibles was not on exhibit 8, which Michael Alderman gave to her in early August 2013.

additional clause limiting payment for hail damage, the annual premium was reduced to $4,399.

¶56  To explain more fully, the hail damage larger deductible shown on Exhibit 106 is not shown on Exhibit 103; the only notation about deductibles on Exhibit 103 is $1,000/$5,000 for "Comp & Coll." Hail is not mentioned. The policy premium shown on Exhibit 103 is $7,493, which is the amount that Rhonda Emer testified Camper Corral paid. Therefore, Exhibit 103[19] combined with Rhonda Emer's testimony about Exhibit 8 shows that the deductible limits that she thought Camper Corral had purchased were commercially available from Western Heritage and Camper Corral was eligible for them at the $7,493 premium she agreed to pay in early August 2013.

¶57  Michael Alderman testified that Camper Corral's premium and coverage are shown in Exhibit 106, which is a quote stating, "$5,000 DEDUCTIBLE APPLIES TO WIND, HAIL, EARTHQUAKE AND FLOOD" for an annual premium of $4,399. The increased deductible for hail damage and the lower premium on Exhibit 106 create a dispute of material fact, as Rhonda Emer testified that she paid $7,493 for her 2013-14 insurance that provided a $1,000/$5,000 deductible for hail damage.

¶58  In light of two previous hailstorms that each created damage in excess of $100,000, reducing the deductible for hail damage was a major concern for Rhonda Emer, but nevertheless, Michael Alderman increased the deductible for hail damage. A review of Rhonda Emer's testimony in regard to the $7,493 premium she believed she paid and the coverage afforded by Exhibit 8, as

---

[19] Michael Alderman identified Exhibit 103. R. at 108, 77.

9

also shown on Exhibit 103, comes in sharp contrast to the lower premium of Exhibit 106, which has a higher hail damage deductible.

¶59 The majority opinion's response to Rhonda Emer's testimony is that Exhibit 103 is only a quote and therefore, it "has nothing to do with what the policy's actual terms would be."[20] However, an insurance quote is a proposal by an insurance company of the terms under which it will provide insurance and the cost thereof. Kimberly J. Winbush, Supplement, Validity, construction, and effect of assault and battery exclusion in liability insurance policey at issue, 44 A.L.R. 5th 91 (1996) (citing Regis Ins. Co. v. All American Rathskeller, Inc., 976 A.2d 1157, 1167 (Pa. Super. Ct. 2009) (discussing a "pre-insurance quote" that identified subsequent limitations of the policy's coverage)). Accordingly, the quote given to Rhonda Emer has probative value in regard to the terms of the policy that she could expect would follow.

¶60 The majority opinion drifts into further error when it fails to recognize that "there may be several substantial factors contributing to the same result." Blashaski v. Classified Risk Ins. Corp., 48 Wis. 2d 169, 175, 179 N.W.2d 924 (1970). As we have explained, "[a]n injury may be produced by several substantial factors, acting in sequence or simultaneously, and responsibility need not be restricted to the last and most immediate factor." Stewart v. Wulf, 85 Wis. 2d 461, 469, 271 N.W.2d 79 (1978) (citation omitted). "Cause is a question for the jury unless the facts are so clear that reasonable persons could not differ on the question." Id. (citation omitted). Michael Alderman's failure to

---

[20] Majority op., ¶37, n.13.

10

provide the insurance policy he said he was providing is a substantial factor in causing Camper Corral's damage.

¶61 Furthermore, although Camper Corral provided proof sufficient to reach a jury on whether a policy with $1,000/$5,000 was commercially available and that Camper Corral was eligible to obtain it, I object to those requirements becoming legal requirements for causation in Wisconsin. The majority opinion is unnecessarily harsh on the consumer and, as it has in this case, will immunize misrepresentations by insurance agents who have superior knowledge of how to search the insurance industry to determine whether the insured was eligible for particularized insurance.

¶62 In addition, the majority opinion relies on Wallace v. Metro. Life Ins. Co., 212 Wis. 346, 248 N.W. 436 (1933), to reason, "we have hinted that availability of the insurance policy to the particular plaintiff is important, not just generalized commercial availability."[21] However, Wallace addressed life insurance for a man with a known heart defect that permanently precluded his insurability. Stated otherwise, Wallace could not change the condition of his heart; it always would affect his insurability. Therefore, Wallace's reasoning that "there is no evidence tending to show that the assured could have obtained other insurance of the same kind and character," id. at 350, has no relevance in regard to insuring for hail damage. This is so because in any given year, hail may not be a factor affecting property damage for Camper Corral, but Wallace's heart condition always would be a

---

[21] Majority op., ¶34.

11

factor affecting his actuarial longevity. Also, Wallace distinguished Kukuska v. Home Mut. Hail-Tornado Ins. Co., 204 Wis. 166, 235 N.W.403 (1931), which dealt with insurance coverage more analogous to the case-at-hand.

¶63  In Kukuska, a farmer applied for crop insurance against hail damage in early July of 1928. Id. at 167. On August 1, 1928, the farmer was notified that his application had been rejected. Id. at 168-69. That same day, a "violent hailstorm" damaged the farmer's crops. Id. at 169. We concluded that "had [the farmer] been seasonably notified, other insurance could have been readily obtained" and we affirmed the judgment in favor of the farmer. Id. at 173-74. We did not place the burden on Kukuska that the circuit court placed and the majority opinion now places on Camper Corral. Here there was no circuit court finding about whether insurance with a $1,000/$5,000 deductible for hail damage could, or could not, have been obtained. Rhonda Emer's testimony, quoted above, simply was ignored.

¶64  The majority opinion presumes that reliance provides an alternative theory for plaintiffs in insurance cases such as this, which is why it concludes that its decision is not harsh on consumers.[22]  It faults Rhonda Emer for not explaining what she would have done differently had she realized that Camper Corral was underinsured.  But what she would have done would be speculation because she believed Camper Corral was properly insured until after the September 3, 2014 hail storm.  Given the

---

[22] Majority op., ¶36, n.11.

vigorous defense that counsel for the defendants provided, speculation would never have found its way to the jury.

¶65 And finally, were I writing for the majority, I would conclude that once general commercial availability in the insurance industry has been shown by the plaintiff, plaintiff has satisfied its burden in regard to causation. Johnson & Higgins of Alaska Inc. v. Blomfield, 907 P.2d 1371, 1374-75 (Alaska 1995); Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 244 (Colo. 1987). If it is raised, uninsurability then becomes an affirmative defense for which the defendant bears the burden of proof. Id. In that manner, the entirety of causation for alleged negligence by an insurance agent can be placed before the finder of fact.

## 2. Summary Judgment

¶66 We also have said that summary judgment, which rests on a legal conclusion by the court, can rest on the same legal theory as a directed verdict. Gagliano, 355 Wis. 2d 258, ¶32 (citing Steven V. v. Kelly H., 2004 WI 47, ¶35, 271 Wis. 2d 1, 678 N.W.2d 856). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Sands v. Menard, 2017 WI 110, ¶28, 379 Wis. 2d 1, 904 N.W.2d 789; Wis. Stat. § 802.08(2).

¶67 Wisconsin Stat. § 802.08(2) provides in relevant part:

The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

13

When a motion for summary judgment is made before trial, we begin our review by determining whether the complaint and answer are sufficient to join issue. Schwegel v. Milwaukee Cty., 2015 WI 12, ¶20, 360 Wis. 2d 654, 859 N.W.2d 78. Then, we examine the moving party's affidavits that support the motion and affidavits that oppose the motion. Id. Here, summary judgment was granted during the course of a jury trial. Therefore, my starting point in this discussion differs from Schwegel; however, the ultimate test remains the same. Summary judgment can be granted only when there is no dispute of material fact. Id.

¶68 Here, the circuit court ignored disputes of material fact and, as a legal conclusion, held that judgment should be entered for Michael Alderman. As I pointed out above, and will not repeat here, there was credible evidence on disputes of material fact, e.g., what did Michael Alderman tell Rhonda Emer about the policy he sold to her. If the jury believed Rhonda Emer's testimony and the related trial exhibits, the jury would have ruled in her favor. Stated otherwise, taking all the testimony in the light most favorable to Camper Corral, there is no legal principle upon which Camper Corral's claim of negligent misrepresentation should have been taken from the jury and decided by a court in favor of Michael Alderman.

¶69 And finally, every court has jumped the gun on this case: First, the circuit court, who seemed to believe that everything an insurance agent says is ok unless there is an expert opinion saying that the agent's statement was not ok; second, the court of appeals, who decided the case by importing into Wisconsin

14

law a new and heavy evidentiary burden on causation for insureds who were told one thing by their insurance agents and found the policy they were sold contained something else; and third, the majority opinion of this court, that affirms the court of appeals new evidentiary burden for proof of causation, but ignores trial court exhibits and testimony that show the evidentiary burden it creates actually was met at trial.

### III.  CONCLUSION

¶70  In conclusion, the majority opinion is wrong on the law and wrong on the facts.  First, it creates a new and rigid evidentiary burden for causation that immunizes an insurance agent's misrepresentations about the insurance policy he said that he was providing and the policy he actually provided, all at the expense of the consumer.[23]  Second, even if I were to accept the new evidentiary burden the majority opinion places on insureds, Rhonda Emer's trial testimony and trial Exhibit 103 provide a factual basis to show that coverage with a $1,000/$5,000 deductible for hail damage was commercially available and that Camper Corral was eligible for that coverage during the 2013-14 policy term because those are the terms that were on the exhibit provided to Camper Corral.  Accordingly, I respectfully dissent.

---

[23] Majority op., ¶3.

15